UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

L.L.,

               Plaintiff,

      v.

KILOLO KIJAKAZI,

            Defendant.

Case No.  20-cv-07438-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT, REVERSING DECISION OF THE COMMISSIONER AND REMANDING FOR AWARD OF BENEFITS**

Re: Dkt. Nos. 25, 28

## I.    INTRODUCTION

On March 17, 2018, Plaintiff L.L.[1] applied for supplemental security income ("SSI") under Title XVI of the Social Security Act, alleging disability beginning January 1, 2014.  The claim was denied initially and upon reconsideration, and E. Alis, an administrative law judge ("ALJ"), held a hearing on November 1, 2019.  On December 12, 2019, the ALJ denied L.L.'s application, and on August 24, 2020, the Appeals Council denied review of L.L.'s appeal of the ALJ's decision, making it the final decision of the Defendant Commissioner of the Social Security Administration ("Commissioner").  After the Appeals Council denied review, Plaintiff sought review in this court pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for summary judgment.  For the reasons stated below, the Court GRANTS Plaintiff's motion for summary judgment, DENIES the Commissioner's motion for summary

_____

[1] Because opinions by the Court are more widely available than other filings and this order contains potentially sensitive medical information, this order refers to Plaintiff using only her initials.

United States District Court
Northern District of California

1    judgment, and REMANDS for an immediate calculation and award of benefits.[2]

2    **II.    BACKGROUND**

3         **A.   The Five-Step Regulatory Framework**

4         Disability insurance benefits are available under the Social Security Act (the "Act") when

5    an eligible claimant is unable "to engage in any substantial gainful activity by reason of any

6    medically determinable physical or mental impairment . . . which has lasted or can be expected to

7    last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42

8    U.S.C. § 423(a)(1).  A claimant is only found disabled if their physical or mental impairments are

9    of such severity that they are not only unable to do their previous work but also "cannot,

10    considering [their] age, education, and work experience, engage in any other kind of substantial

11    gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

12         The Commissioner has established a sequential, five-part evaluation process to determine

13    whether a claimant is disabled under the Act.  *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir.

14    1999) (citing 20 C.F.R. § 404.1520).  The claimant bears the burden of proof at steps one through

15    four, but the burden shifts to the Commissioner at step five.  *Id.*  "If a claimant is found to be

16    'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent

17    steps."  *Id.*

18         At step one, the ALJ considers whether the claimant is presently engaged in "substantial

19    gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).[3]  If the claimant is engaged in such activity, the

20    ALJ determines that the claimant is not disabled, and the evaluation process stops.  *Id.*  If the

21    claimant is not engaged in substantial gainful activity, the ALJ continues to step two.  *See id.*

22         At step two, the ALJ considers whether the claimant has "a severe medically determinable

23    physical or mental impairment" or combination of such impairments that meets the regulations'

24    twelve-month durational requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  An impairment

25    or combination of impairments is severe if it "significantly limits [the claimant's] physical or

26

27    [2] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C.
      § 636(c).

28    [3] The Court cites the regulations applicable to disability insurance benefits applications because the
      parallel SSI regulations are virtually identical.

2

United States District Court
Northern District of California

1    mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  If the claimant does not have

2    a severe impairment, disability benefits are denied.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ

3    determines that one or more impairments are severe, the ALJ proceeds to the next step.  *See id.*

4        At step three, the ALJ compares the medical severity of the claimant's impairments to a

5    list of impairments that the Commissioner has determined are disabling ("Listings").  *See* 20

6    C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination

7    of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is

8    disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

9        At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and

10   past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The RFC is "the most [a claimant] can still

11   do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's]

12   case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then determines whether, given the claimant's

13   RFC, the claimant would be able to perform their past relevant work.  20 C.F.R. § 404.1520(a)(4).

14   Past relevant work is "work that [a claimant] has done within the past fifteen years, that was

15   substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."

16   20 C.F.R. § 404.1560(b)(1).  If the claimant is able to perform their past relevant work, then the

17   ALJ finds that they are not disabled.  If the claimant is unable to perform their past relevant work,

18   then the ALJ proceeds to step five.

19       At step five, the Commissioner has the burden to "identify specific jobs existing in

20   substantial numbers in the national economy that the claimant can perform despite [the claimant's]

21   identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v.*

22   *Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner meets this burden, the

23   claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and

24   entitled to benefits if there are not a significant number of jobs available in the national economy

25   that the claimant can perform.  *Id.*

26       **B.  Supplemental Regulations for Determining Mental Disability**

27       The Social Security Administration has supplemented the five-step general disability

28   evaluation process with regulations governing the evaluation of mental impairments.  *See*

1   *generally* 20 C.F.R. § 404.1520a.  First, the Commissioner must determine whether the claimant

2   has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  Next, the

3   Commissioner must assess the degree of functional limitation resulting from the claimant's mental

4   impairment with respect to the following functional areas: 1) understand, remember, or apply

5   information; 2) interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or

6   manage oneself.  20 C.F.R. §§ 404.1520a(b)(2), (c)(3).  Finally, the Commissioner must

7   determine the severity of the claimant's mental impairment and whether that severity meets or

8   equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the

9   Commissioner determines that the severity of the claimant's mental impairment meets or equals

10  the severity of a listed mental impairment, the claimant is disabled.  *See* 20 C.F.R.

11  § 404.1520(a)(4)(iii).  Otherwise, the evaluation proceeds to step four of the general disability

12  inquiry.  *See* 20 C.F.R. § 404.1520a(d)(3).

13         Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the

14  presence of various listed mental impairments, but all listed mental impairments have certain

15  "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity

16  criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Any medically determinable

17  mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental

18  impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general

19  Paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme'

20  limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  *Id*. at

21  12.00(A)(2)(b). A claimant has a "marked" limitation if the claimant's "functioning in this area

22  independently, appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R.

23  § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d).  A claimant with an "extreme" limitation is "not able

24  to function in this area independently, appropriately, effectively, and on a sustained basis."  20

25  C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(e).

26         This evaluation process is to be used at the second and third steps of the sequential

27  evaluation discussed above.  Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The

28  adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C'

United States District Court
Northern District of California

4

1   criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at

2   steps 2 and 3 of the sequential evaluation process.").  If the Commissioner determines that the

3   claimant has one or more severe mental impairments that neither meet nor are equal to any listing,

4   the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R. §

5   404.1520a(d)(3).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of the

6   sequential process [and] requires a more detailed assessment by itemizing various functions

7   contained in the broad categories found in paragraphs B and C of the adult mental disorders

8   listings in 12.00 of the Listing of Impairments . . . ."  Social Security Ruling 96-8p, 1996 WL

9   374184, at *4.

10          **C.  Factual Background**

11          L.L. was 44 years old at the time her application was filed.  Administrative Record ("AR")

12   30.  She lives alone in Housing and Urban Development subsidized housing in Oakland, where

13   she is from.  *Id.* at 69, 363, 449, 697.  She dropped out of high school when she was in tenth grade,

14   although she has completed her GED and attended some community college.  *Id.* 449, 697.  She

15   reports that her last employment was as an in-home caretaker in 2014, which lasted for one month.

16   *Id.* at 59, 286.  Prior to that, she worked at a concessions stand for one month in 2003.  *Id.* at 81–2,

17   287.  L.L. testified that she worked briefly at Ghirardelli Chocolate but could not continue

18   working there because of her asthma.  *Id.* at 72.  She reported that she has not sought out new

19   employment as a caretaker because her back pain prevents her from performing the required

20   chores.  *Id.* at 60.  She survives off General Assistance and food stamps.  *Id.* at 69, 442.

21          L.L. testified that she has no close relationships in her life apart from her relationship with

22   her younger son.  *Id.* at 74.  She was married in 2011 and divorced in 2015.  *Id.* at 363, 697.  Of

23   her three adult sons, one is in prison serving a sentence of forty-five years to life and another has

24   lost contact with her.  *Id.* at 74, 449, 586, 697.  L.L. also reported that she was emotionally abused

25   and ostracized by several family members.  *Id.* at 70, 587.

26          L.L. has a history of severe trauma.  She was sexually assaulted by a family friend and

27

28

5

again by a neighbor as a young child. *Id.* at 17, 448, 587, 697.[4] When she told her parents, they did not believe her. *Id.* at 697. Her mother was an alcoholic and her father neglected her and physically abused her. *Id.* at 448, 587. When she was nine years old, her home was raided, and her brothers and mother went to jail. *Id.* at 697. Her mother forced her out of the house when she was seventeen and pregnant. *Id.* She eventually moved back in with her mother, but she became homeless at age twenty when her mother passed away. *Id.* L.L. has also endured domestic violence from multiple partners, which she never reported to protect her children. *Id.* at 70–71, 448, 587. At the hearing, L.L. testified that she recently saw her childhood abuser at her church after he was released from prison, which triggered significant fear and anxiety. *Id.* at 69–70, 448. She has reported suicidal ideation and thoughts of self-harm. *Id.* at 448, 584, 698.

L.L. suffers from several physical and mental health conditions. The ALJ determined that L.L. suffers from major depressive disorder ("MDD"), post-traumatic stress disorder ("PTSD"), panic disorder with agoraphobia, asthma, chronic obstructive pulmonary disease ("COPD"), lower back degenerative disk disease, and left knee degenerative joint disease. *Id.* at 23. L.L.'s mental health conditions began at age nineteen, her respiratory symptoms began in childhood, and her back pain developed more recently. *Id.* at 19, 448.

L.L. received routine mental healthcare beginning in 2017. She engaged in weekly therapy sessions with Pujita Latchman, LMFT beginning in February of 2017. *Id.* at 584. Pujita Latchman diagnosed L.L. with PTSD and panic disorder with agoraphobia and determined that L.L.'s Global Assessment of Function ("GAF") score was 58. *Id.* at 590. Pujita Latchman also indicated that L.L. experiences insomnia, goes multiple days without eating, has weekly panic attacks, and routinely does not get out of bed for twenty-four to forty-eight hours at a time. *Id.* at 584, 590. L.L. also received psychiatric care from Pathways to Wellness every one to two months beginning in April of 2017. *See, e.g.*, *id.* at 12–17, 37–53, 391–403, 577, 779–795, 803–811, 922–

---

[4] The AR indicates several different instances of sexual assault. Records from Amber Aguilar indicate that L.L was assaulted at ages eight and nine. AR 17. Records from Dr. Tania Shertock indicate that L.L. was assaulted at age nine and again at age twelve. *Id.* at 448. Records from Pujita Latchman indicate that L.L. was assaulted from ages six to eight. *Id.* at 587. Records from Dr. Laura Catlin indicate that she was assaulted at age ten. *Id.* at 697.

938. [5]  Providers at Pathways to Wellness diagnosed L.L. with MDD with a history of child abuse. *See, e.g.*, *id.* at 39, 396, 781, 805, 923.  They have also prescribed several medications for her mental health conditions.  Her latest "Mental Impairment Questionnaire" from Pathways to Wellness shows prescriptions for Quetiapine, Duloxetine, Trazadone, Hydroxyzine, and Rexulti. *Id.* at 12.  In the past, Pathways to Wellness providers have also prescribed Lorazepam, Escitalopram, Mirtazapine, and Ambien.  *Id.* at 38, 780.  L.L. testified that her psychiatric medications do not help and that she is still working with her doctors to find medications that work. *Id.* at 79.

On July 6, 2018, Dr. Hiawatha Harris from Pathways to Wellness found that L.L. has an overall moderate limitation in her ability to understand, remember, and apply information; an overall moderate limitation in her ability to interact with others; an overall marked limitation in her ability to concentrate, persist, or maintain pace; and an overall moderate limitation in her ability to adapt or manage herself.  *Id.* at 579–80.  On February 13, 2020, Amber Aguilar, DNP and PMHNP from Pathways to Wellness, rated L.L.'s overall limitation in those four categories as moderate, moderate, moderate, and mild, respectively.  *Id.* at 14–15.  Pathways to Wellness providers consistently determined that L.L.'s GAF score was 55.  *See, e.g.*, *id.* at 396, 805, 928. Dr. Harris determined that L.L. would miss four days or more of work per month and be off task 25% of the time, while Amber Aguilar determined that L.L. would miss four days or more of work per month and be off task 30% of the time.  *Id.* at 16, 581.

L.L. also received two psychological evaluations from non-treating physicians.  In October of 2017, Dr. Tania Shertock performed a mental consultative examination and diagnosed L.L. with PTSD, MDD, and panic disorder with agoraphobia.  *Id.* at 451.  Dr. Shertock found that L.L. was capable of understanding, remembering, and carrying out simple instructions but had a moderate impairment in all other work-related abilities, including the ability to "[u]nderstand, remember, and carry out complex instructions" and to "[m]aintain adequate persistence while completing

---

[5] Some records from Pathways to Wellness were submitted after the ALJ's decision, upon appeal. AR 12–17, 37–53.  The Court may consider the additional materials because the Appeals Council considered them in the context of denying L.L.'s request for review.  *See Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2001).

tasks." *Id*. Dr. Shertock determined L.L.'s GAF was 50 and noted that L.L.'s "ability to interact with the public, supervisors, and coworkers appears questionable." On November 19, 2018, L.L. was evaluated by Dr. Laura Catlin and diagnosed with MDD, mild intellectual disability, PTSD, and features of borderline personality disorder. *Id.* at 701. Dr. Catlin determined that L.L. would have an overall "marked impairment" performing in the workplace and that she was "unable to engage in any meaningful employment and would not be able to obtain or retain a job" for "at least 12 months." *Id.* at 703–05 (emphasis omitted).

L.L. has also received treatment for several chronic physical conditions, including asthma, bronchitis, COPD, back pain, nicotine dependence, and foot pain. *See, e.g.*, *id.* at 374, 464, 484, 508–09, 612, 672–73, 885. She primarily received care from providers within the Alameda Health System, and they have prescribed many medications to manage her physical conditions, including Ibuprofen, an Albuterol inhaler, a QVAR inhaler, Guaifenesin, Codeine, NicoDerm, Norco, Albuterol, Singulair, Spiriva, Sulindac, and Symbicort. *See, e.g.*, *id.* at 458, 850–51. At the hearing, L.L. testified that she had not received adequate medications to manage her pain in the last six months and that she was unable to abstain from using her inhaler for long enough to receive a lung function test. *Id.* at 65–66. Several providers have also frequently advised her to quit smoking. *See, e.g.*, *id.* at 375, 509, 887. On September 8, 2016, Christa Robertson, NP, who provided L.L. with primary care for several years, determined that L.L. was unable to work for one year given her medical and mental health issues. *Id.* at 420. On June 15, 2017, Christa Robertson recommended a service animal for L.L. to cope with her severe depression. *Id.* at 421. Again, on October 4, 2017, Christa Robertson determined that L.L.'s COPD and back pain prevented her from working and that this situation was persistent. *Id.* at 439—40. At that time, Christa Robertson also recommended that L.L. be referred for an evaluation of her "severe anxiety" that may prevent her from being able to work. *Id.* at 440. From March through June of 2017, L.L. attended physical therapy for her pain, although she reported that it made her pain worse. *Id.* at 80, 404–12.

Dr. Robert Tang performed an internal medicine consultative examination on L.L. on October 13, 2017, and although he did not provide a specific diagnosis, he noted that her mental

United States District Court
Northern District of California

health conditions prevent her from having the "motivation to stop smoking . . . and participate in physical therapy." *Id.* at 445.  Dr. Tang also found that L.L. had "some degree of degenerative joint [sic] not helped by inactivity and overweight status." *Id.*

In July 2018, September 2018, and January 2019, non-examining state agency medical consultants reviewed L.L.'s record and determined that she was not disabled and that she had the ability to perform light work. *Id.* at 98, 109, 132.  They found the opinion expressed by Dr. Harris on July 16, 2018, regarding L.L.'s impairments unpersuasive because "the opinion relies heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion." *Id.* at 125, 130.  The consultants likewise found the opinion expressed by Christa Robertson on October 4, 2017, unpersuasive and the opinion expressed by Dr. Tang on October 13, 2017, partially persuasive. *Id.* at 125, 130–31.  The consultants deemed both opinions to be "an overestimate of the severity of the individual's restrictions/limitations." *Id.* at 130–31.

At the hearing, L.L. testified that she is unable to work because of her physical and mental disabilities. *Id.* at 61.  She testified that her chronic back pain makes it difficult to lift anything, although she can lift a ten-pound bag of potatoes if necessary, and her COPD leaves her unable to walk at a normal pace. *Id.* at 62.  She also testified that she has to take baby steps when walking, cannot stand at the bus stop, and must bring a chair to stand in line at the food bank because standing becomes difficult after ten minutes. *Id.* at 62–63.  L.L. reported having trouble sleeping and eating regularly and that she does not have enough energy to get through a typical day. *Id.* at 66–67.  She testified that she often cannot stand long enough to do her dishes, is forgetful and easily distracted, gets overwhelmed easily, occasionally leaves food burning on the stove, and talks to herself. *Id.* at 68, 72—73.  She reported that she drinks approximately three drinks twice a week, smokes marijuana approximately twice a week, and smokes roughly a pack of cigarettes daily when she has funds available. *Id.* at 75–77.  At the hearing, the vocational expert ("VE") testified that a hypothetical worker of L.L.'s same age and education who had the RFC to perform light work as described by the ALJ would not be able to perform as a caretaker but would be able to perform as a checker one, as an inspector and hand packer, and as a mail clerk. *Id.* at 83.  The

VE also testified that if an individual is absent from work more than once per month or is off task more than 15% of the day, that person is unemployable.  *Id.* at 86.

### D.  The ALJ's Decision

The ALJ ultimately determined that L.L. was not disabled at step five of the disability determination.[6]  *Id.* at 30–31.

At step one, the ALJ concluded that L.L. had not engaged in substantial gainful activity since March 17, 2018, her application date. *Id.* at 23.

At step two, the ALJ determined that L.L. had the following severe impairments: asthma, COPD, low back degenerative disk disease, left knee degenerative joint disease, MDD, PTSD, and panic disorder with agoraphobia. *Id.*

At step three, the ALJ held that L.L. did not have an impairment or combination of impairments that meets or medically equals the criteria of listings 1.02 (major dysfunction of a joint due to any cause), 1.04 (disorders of the spine), 3.03 (asthma), 3.02 (chronic respiratory disorders), 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.5 (trauma- and stressor-related disorders). *Id.* at 23–26.  With respect to her mental impairments, the ALJ found L.L. had a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing herself.  *Id.* at 24–26.  The ALJ thus concluded that L.L.'s impairments did not meet the "paragraph B" criteria because L.L. did not have two marked limitations or one extreme limitation in the functional categories. *Id.* at 26.  The ALJ also concluded that L.L.'s impairments did not meet the "paragraph C" criteria.  *Id.*

At step four, the ALJ found that L.L. had the RFC to perform:

> light work . . . except she can lift and carry 20 pounds occasionally
> and 10 pounds frequently; stand, walk, and sit each for six hours in
> an eight-hour workday; push and pull the same as lift and carry;
> frequently climb ramps and stairs, balance, stoop kneel, crouch, and

---

[6] Although L.L. claimed an onset date of January 1, 2014, the ALJ considered only whether L.L. was under disability from the date she filed her application for SSI, March 17, 2018.  AR 21.  L.L. does not challenge the ALJ's use of this date as the effective onset date.

United States District Court
Northern District of California

> crawl; occasionally climb ladders, ropes, and scaffolds . . . limited to simple, routine tasks; occasional interaction with supervisors, occasional interaction with co-workers (but not in tandem, team, or group settings), and occasional superficial public interaction (such as greeting customers, or directing a customer to the location of the nearest restroom); and must work in a stable environment (meaning few changes, if any, in the day to day work setting and in the tools and/or work processes used to accomplish tasks).

*Id.* In determining this, the ALJ did not fully credit L.L.'s statements about the intensity, persistence, and limiting effects of her symptoms, finding that they were not entirely consistent with the medical evidence and other evidence in the record. *Id.* at 27. The ALJ found the GAF scores reported by Pathways to Wellness providers, Pujita Latchman, and Dr. Shertock somewhat persuasive and the opinions of the non-examining medical consultants generally persuasive. *Id.* at 29. Otherwise, the ALJ found the opinions of L.L.'s treating providers and Dr. Catlin unpersuasive. *Id.* The ALJ found that L.L. could not perform her past relevant work as a caretaker based on her RFC and the VE's testimony. *Id.* at 30.

At step five, the ALJ determined that there were jobs that exist in significant numbers in the national economy that a person of L.L.'s age, education, work experience, and residual functional capacity could perform, including checker one (DOT: 222.687-010); inspector, hand packer (DOT: 559.687-074); and mail clerk (DOT 209.687-026). *Id.* at 30–31. As such, the ALJ found that L.L. was not disabled. *Id.* at 31.

## III.    ISSUES FOR REVIEW

L.L. seeks reversal of the Commissioner's denial of benefits for four reasons, arguing that:

(1) the ALJ erred in evaluating the medical evidence;

(2) the ALJ improperly rejected L.L.'s testimony and allegations;

(3) the ALJ erred in determining that L.L.'s impairments do not meet or equal a listed impairment; and

(4) the ALJ erred in formulating the RFC.

## IV.    ANALYSIS

### A.    Standard of Review

District courts have jurisdiction to review the final decisions of the Commissioner and may

11

affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).  When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free of legal error and supported by "substantial evidence."  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401. (1971).  "'Substantial evidence' means more than a mere scintilla," *id*., but "less than preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (internal citation omitted).  Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

### B.    The ALJ Erred in Evaluating the Medical Evidence

The ALJ erred in determining that the opinions of L.L.'s treating providers and Dr. Catlin were unpersuasive because they are allegedly inconsistent. *See* AR 29.  Those opinions are consistent with each other, with L.L.'s testimony, and with the record as a whole.  The ALJ cannot "cherry-pick" evidence to find inconsistencies, and to the extent that the opinions of L.L.'s treating providers and Dr. Catlin are inconsistent with the opinions of the non-examining state agency consultants and Dr. Shertock, L.L.'s treating providers and Dr. Catlin should be given greater weight because their opinions are supported by substantially more medical evidence.  Furthermore, the ALJ erred in determining that the opinions of the non-examining state agency medical consultants were persuasive. *See id.*  Those opinions are not supported by substantial medical evidence, and they are inconsistent with the record.

#### 1.    Legal Standards

For claims filed before March 27, 2017, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).  However, the regulations regarding the evaluation of medical evidence have been amended and several of the prior Social Security Rulings, including SSR 96-2p ("Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions"), have been rescinded for claims protectively filed after March 27, 2017, as is the case here.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c (a), 416.920c(a).

The new regulations provide that the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  20 C.F.R. § 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following factors: 1) supportability; 2) consistency; 3) relationship with the claimant; 4) specialization; and 5) "other factors."  20 C.F.R. § 416.920c(a)-(c).  "Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [they] considered the medical opinions' and 'how persuasive [they] find all of the medical opinions.'" *Christopher Charles A. v. Comm'r of Soc. Sec.*, No. C19-5914-MLP, 2020 WL 916181, at *2 (W.D. Wash. Feb. 26, 2020) (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)); *see also Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

As with all other determinations made by the ALJ, the ALJ's explanation must be supported by substantial evidence.  *See Woods, 32 F.4th* at 787 (holding that, under the new regulations, "an ALJ's decision . . . must simply be supported by substantial evidence"); *Patricia F. v. Saul*, No. C19-5590-MAT, 2020 WL 1812233, at *4 (W.D. Wash. Apr. 9, 2020) (citing 82 Fed. Reg. at 5852) (finding that, under the new regulations, "[t]he Court must . . . continue to consider whether the ALJ's analysis has the support of substantial evidence"); *J.B. v. Kijakazi,* No. 20-cv-06231-VKD, 2022 WL 282513, at *3 (N.D. Cal. January 31, 2002).

The two "most important factors for determining the persuasiveness of medical opinions

are consistency and supportability," which are the "same factors" that "form[ed] the foundation of the [prior] treating source rule."  Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.  The ALJ is required to explicitly address supportability and consistency in their decision.  20 C.F.R. § 404.1520c(b)(2).  With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  With respect to "consistency," the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

Typically, the ALJ "may, but [is] not required to," explain how they considered the remaining three factors listed in the regulations.  *Id.*  However, where two or more distinct medical opinions are equally supported and considered, the ALJ is required to articulate how they considered factors other than supportability and consistency, including the treatment relationship. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3); *see also Woods*, 32 F.4th at 792; *Ceja v. Comm'r of Soc. Sec.*, No. 1:20-CV-01267-EPG, 2021 WL 4690742, at *1 (E.D. Cal. Oct. 7, 2021).

The third factor, relationship with the claimant, is split into five sub-factors.  20 C.F.R. §§ 404.1520c(c)(3), 416.927c(c)(3).  When analyzing the relationship with the claimant, the adjudicator should consider: (1) the length of the treatment relationship; (2) the frequency of examinations; (3) the purpose of the treatment relationship; (4) the extent of the treatment relationship; and (5) whether there was an examining relationship.  *Id.*  In evaluating how the "relationship with the claimant" affects the weight that should be given to medical opinions, the regulations elaborate as follows regarding each of the five sub-factors:

> (i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

> (ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal

understanding of your impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

20 C.F.R. § 404.1520c(c)(3)(i)-(v).

Specialization, the fourth factor, suggests that a medical opinion is more persuasive if the source is a specialist in an area relevant to the claimant's conditions. 20 C.F.R. §§ 404.1520c(c)(4), 416.927c(c)(4). Finally, the catch-all provision, "other factors," permits adjudicators to consider "other factors that tend to support or contradict" a medical opinion. 20 C.F.R. §§ 404.1520c(c)(5); 416.927c(c)(5) (including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements.").

L.L. argues that the ALJ is still required to provide specific and legitimate reasons supported by substantial evidence to explain his reasoning for rejecting the opinions of treating providers. Pl.'s Reply (dkt. 30) at 2. The Commissioner, on the other hand, argues that the ALJ is not required to explain how other factors such as the existence of a treating relationship were considered, unless the ALJ found that two or more medical opinions about the same issue were both equally well-supported and consistent with the record, but not identical. Def.'s Corrected Cross-Mot. (dkt. 28) at 5.

The Social Security Administration ("SSA") is a regulatory agency with "broad authority to interpret the statutes [it is] charged with applying, [and] as long as [its] regulations are not arbitrary and capricious or contrary to the statute, . . . courts must defer to validly adopted regulatory interpretations." *George D.D.L. v. Saul*, No. 20-cv-03552-SK, 2021 WL 5205600, at *3 (N.D. Cal. Nov. 9, 2021) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S.

United States District Court
Northern District of California

837 (1984)); *see also Barnhart v. Walton*, 535 U.S. 212, 222 (2002) (holding that SSA interpretation of duration requirement for disability benefits was entitled to deference under *Chevron*).  An agency's contrary interpretation will supersede a prior judicial construction unless the "prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."  *George D.D.L.*, 2021 WL 5205600 at *3 (quoting *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005)).

The treating physician rule, as determined by the Ninth Circuit, "was not derived from the unambiguous terms of the statute" *George D.D.L.*, 2021 WL 5205600 at *3, but was instead "originally developed by Courts of Appeals as a means to control disability determinations by administrative law judges under the Social Security Act." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003); *see also Agans v. Saul*, No. 2:20-cv-00508 AC, 2021 WL 1388610, at *6 (E.D. Cal. Apr. 13, 2021) (describing the source and evolution of the treating physician rule).  "When the SSA later adopted regulations approving and formalizing use of the rule in the Social Security disability program, the agency noted that '[n]one of the circuit courts of appeals has held that its treating physician rule is required by the Act or Constitution.'" *George D.D.L.*, 2021 WL 5205600 at *3 (quoting Final Rules, Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 (1991)).  Accordingly, the SSA's new regulations regarding the examination of and weight given to medical providers supersede the Ninth Circuit's treating physician rule. *Id.*; *see also Woods*, 32 F.4th at 787 (holding that "[f]or claims subject to the new regulations, the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies").

The Ninth Circuit previously required an ALJ to provide "clear and convincing reasons that are supported by substantial evidence" to reject an uncontradicted opinion of a treating or examining physician. *Trevizo*, 871 F.3d at 675; *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014).  Alternatively, "[i]f a treating or examining doctor's opinion [was] *contradicted* by another doctor's opinion, an ALJ [could] only reject it by providing specific and legitimate

reasons that [were] supported by substantial evidence." *Trevizo*, 871 F.3d at 675.  An ALJ "could meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

In *Woods*, the Ninth Circuit ruled that the new regulations displace prior caselaw requiring the ALJ to provide "clear and convincing" or "specific and legitimate" reasons for rejecting a treating or examining doctor's opinion, finding that requirement "incompatible with the revised regulations." 32 F.4th at 792.[7]  The court held that its precedent on this matter was not controlling because the "reasoning or theory" underlying that precedent was "'clearly irreconcilable with the reasoning or theory of intervening higher authority,' which in this case is the agency's updated regulations." *Id.* at 790 (quoting *Lambert v. Saul*, 980 F.3d 1266, 1274 (9th Cir. 2020)).  Under *Woods*, "the decision to discredit any medical [opinion] must simply be supported by substantial evidence," including a discussion of how the ALJ "considered the supportability and consistency factors." *Id.* at 787, 792 (citing 20 C.F.R. § 404.1520c(b)(2)).  Therefore, the new regulations provide that the extent of the medical provider's relationship to the claimant is only relevant if the ALJ reaches the other factors beyond supportability and consistency, such as when "two or more medical opinions . . . about the same issue are . . . equally well-supported . . . and consistent with the record . . . but are not exactly the same." *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(b)(3)).  Otherwise, the ALJ is not required to consider the treating relationship factors.

### 2.  The ALJ Erred in Finding the Opinions of L.L.'s Treating Providers Unpersuasive

The ALJ found the opinions of all of L.L.'s treating providers unpersuasive, except for the GAF scores they provided.  A.R. at 28–29.  The ALJ rejected the opinions of providers from Pathways to Wellness, who provided L.L. with monthly[8] psychiatric care, including their

---

[7] The *Woods* decision explicitly rejects only the rule requiring "specific and legitimate" reasons for finding an examining doctor's opinion unpersuasive, but it implicitly rejects the requirement for "clear and convincing" reasons by requiring only substantial evidence to discredit a medical opinion. 23 F.4th at 787.
[8] Dr. Harris noted that Pathways to Wellness providers saw L.L. once a month, while Amber

1    determinations that L.L. had several marked limitations.  *Id.* at 29, 577–583.  The ALJ also

2    rejected the opinions of Pujita Latchman, who provided L.L. with weekly therapy, although the

3    ALJ did not cite which of Pujita Latchman's opinions he found unpersuasive.  *Id.* at 29, 584.

4    Lastly, the ALJ rejected the opinions of Christa Robertson, who provided L.L. with primary care

5    for several years, including the determinations that L.L. could not work and would benefit from a

6    support animal.  *Id.* at 29, 420, 421, 439.  Ultimately, the ALJ erred in finding the opinions of

7    L.L.'s treating providers unpersuasive, since those opinions are supported by objective medical

8    evidence, and they are consistent with each other and with the record as a whole.

9         L.L. saw Pathways to Wellness providers, Pujita Latchman, and Christa Robertson

10   regularly, and, as a result, the record contains multiple opinions and findings from each of them.

11   Where a single medical source provides multiple opinions or findings, the regulations provide that

12   an ALJ "will articulate how [the ALJ] considered the medical opinions or prior administrative

13   medical findings from that medical source *together in a single analysis* using the factors listed in

14   paragraphs (c)(1) through (c)(5)."  20 C.F.R. § 404.1520c(b)(1) (emphasis added) (explaining that

15   "voluminous case records" necessitate source-level articulation).  Accordingly, the ALJ's single

16   statement that "these opinions are not persuasive," must be viewed by the Court as a rejection of

17   all of the treating providers' findings and opinions, except the GAF scores, which the ALJ found

18   somewhat persuasive.  *See* AR 29.

19        The ALJ rejected the opinions of L.L.'s treating providers for lack of consistency, although

20   the ALJ did not distinguish his reasoning for rejecting the opinions of each provider.  Rather, the

21   ALJ generally held that those opinions were:

22             not consistent with the evidence that, in general, [L.L.] was alert and
              oriented to person, place, and time, her mood and affect were normal,
23             she was cooperative and pleasant, her memory was normal, her
              concentration was normal, her cognition was normal, her judgment
24             and insight were normal, and she denied suicidal ideation or past
              attempts.
25

26   *Id.*  Additionally, the ALJ held that the opinions are inconsistent with L.L.'s testimony that "her

27   _____

28   Aguilar noted that Pathways to Wellness providers saw L.L. every one to two months.  AR 12,
     577.

18

1    stress is from her landlord and problems accessing health care for physical needs, and that she had

2    only pets and not any emotional support animals." *Id.* Finally, the ALJ held that the treating

3    providers' opinions that L.L. had marked limitations were inconsistent with her testimony

4    regarding her "ability to use public transportation and switch buses at least four times to reach a

5    medical appointment and her continued smoking of a pack of cigarettes per day," as well as her

6    ability to "sit for more than forty-five minutes throughout the hearing before getting up to stand."

7    *Id.* at 29–30.  None of these reasons is sufficient for rejecting the treating providers' opinions

8    under the new regulations because they do not constitute substantial evidence for finding those

9    opinions inconsistent.

### a.  The Treating Providers' Opinions Are Not Inconsistent with Records of L.L.'s Mental Status

12        The Court's review of L.L.'s extensive medical records reveals that the ALJ "cherry-

13    picked" evidence to determine that the treating providers' opinions were inconsistent with L.L.'s

14    "generally unremarkable mental status examinations." *Id.* at 28.  The ALJ isolated evidence of

15    unremarkable mental status and demeanor, and in some instances misstated that evidence, within

16    records that, overall, indicate significant deviations from normal.  Moreover, the ALJ "cherry-

17    picked" evidence from several visits and hospitalizations during which L.L.'s mental status was

18    observed but was not being tested.  The Ninth Circuit has held that "cycles of improvement and

19    debilitating symptoms are a common occurrence, and in such circumstances, it is error for an ALJ

20    to pick out a few isolated instances of improvement over a period of months or years and to treat

21    them as a basis for concluding a claimant is capable of working."  *Garrison v. Colvin*, 759 F.3d

22    995, 1017 (9th Cir. 2014).  As such, the ALJ erred in "cherry-picking" evidence to discredit the

23    opinions of L.L.'s treating providers.

24        The ALJ cited to records of L.L.'s normal mental status and demeanor in Dr. Shertock's

25    consultative examination, treatment records from Pujita Latchman, Dr. Catlin's consultative

26    examination, and progress notes from Pathways to Wellness, but each of these records also

27    indicates significant deviations from normal.  AR 28.  Although Dr. Shertock noted that L.L. was

28    "cooperative," her affect was "[f]ull [r]ange-mood congruent," and that she was "alert and

19

oriented," Dr. Shertock also noted that L.L.'s memory was "not grossly intact," that she "endorsed current auditory hallucinations and illusions," that she is "unable to relate in an adequate manner," and that she had moderate impairment in a range of work-related abilities, including the ability to "maintain attention and concentration for the duration of the evaluation." *Id.* at 449–51. Pujita Latchman noted that L.L. had normal presentation, affect, thought process, thought content, perception, cognition, insight, and judgment in one medical evaluation form, but Pujita Latchman also reported that L.L. "goes multiple days on end without eating, has panic attacks approximately once a week . . . reports thoughts of self-harm," and often does not "get out of her bed or eat for 24–48 hours." *Id.* at 584, 588. Dr. Catlin found that L.L. appeared "alert and oriented" and her "thought process was goal directed and logical," but also noted that, among other findings, L.L. had some suicidal thoughts, her mood was depressed and anxious, her judgment was limited, her memory and attention were severely impaired, and that her general cognitive ability was in the extremely low range. *Id.* at 698–703. Lastly, although Pathways to Wellness providers noted, at times, that L.L.'s memory was intact, her judgment and attention were fair, and that she was not a danger to herself, at other times they noted that her affect was sad, anxious, irritable, and angry; her behavior was agitated and restless; her speech was loud and excessive; her attention and concentration were poor; and her mood was sad, anxious, irritable, and angry. *See, e.g.*, *id.* at 781–82, 928–29. Overall, the ALJ erred in finding that these records reflect that L.L. generally had normal mood and affect, normal memory, normal cognition, normal judgment and insight, and lacked suicidal ideation. *Id.* at 28. Rather, these records reflect isolated instances of such findings amongst substantial evidence that, taken together, indicate significant deviations from normal in those categories.

The other evidence that the ALJ cited of L.L.'s allegedly unremarkable mental status consists of "cherry-picked" observations regarding L.L.'s presentation that were unrelated to the issue for which L.L. was being seen and examined. For example, the ALJ cited boilerplate notations such as "PSYCH: Calm, NL Behavior" and "NEUR: CNs Intact, NL Motor/Sense/Speech" when L.L. was treated by the Emergency Department at St. Joseph's Medical Center after forty episodes of coughing, chest tightness, and associated pain. *Id.* at 28,

425–26.  The ALJ also cited boilerplate notations that L.L. was "[o]riented to time, place, person & situation," and had "[a]ppropriate mood and affect" during a follow-up visits to the Eastmont Wellness Center for COPD where she complained of chest pain and chills, even though the "Review of Systems" for that same visit indicates "[d]ifficulty concentrating, [f]eeling down, depressed or hopeless (nearly every day), [f]eelings of guilt, [l]ittle interest or pleasure in doing things (nearly every day)." *Id.* at 508–15.  The ALJ cited similar observations regarding L.L.'s unremarkable mood, affect, and orientation during follow-up visits for bone spurs and vaginal discharge.  *Id.* at 668, 718.  Ultimately, the ALJ erred in determining that isolated observations of unremarkable mental status within non-psychiatric treatment records should discredit the opinions of L.L.'s treating providers.

### b.  The Treating Providers' Opinions Are Not Inconsistent with L.L.'s Testimony

The ALJ also erred by failing to explain how the opinions of L.L.'s treating providers are inconsistent with L.L.'s testimony that her stress is from her landlord and problems accessing health care for physical needs, that she had pets but no emotional support animals, that she rode public transportation, and that she smoked a pack of cigarettes per day.  *See id.* at 29–30.  None of these admissions conflicts with the treating providers' assessments of L.L.'s impairments.

L.L.'s testimony regarding her disputes with her landlord and her challenges accessing medical care do not contradict the opinions of L.L.'s treating providers regarding the impact of her physical and mental impairments on her ability to work.  It is possible that L.L. endures stress from her landlord and accessing medical care while also suffering psychological symptoms that are unrelated to those factors.  Moreover, the Court is not aware of any evidence that suggests those are the *only* sources of her psychological symptoms or that her symptoms are merely situational.  For example, in her testimony, L.L. described not getting out of bed due to her depression, having trouble sleeping and eating regularly, the ongoing impacts of childhood sexual abuse and domestic violence, feeling like she "can't function," talking to herself without realizing it, forgetting chores in the middle of performing them, her anxiety that makes her mind "[run] crazy," how she doesn't trust people, and how her anxiety, depression, and COPD limits her

ability to take the bus. *Id.* 57–80.  These descriptions are consistent with Pujita Latchman's diagnosis of PTSD and panic disorder, Pathways to Wellness providers' diagnosis of MDD with a history of child abuse, and Christa Robertson's finding of severe depression and anxiety.  *See, e.g.*, *id.* at 396, 421, 440, 590.  While the ALJ cited one instance in which a Pathways to Wellness provider noted that L.L. appeared "anxious and depressed about current health and living situation," the ALJ selectively ignored copious evidence from L.L.'s treating providers regarding other social and non-social factors affecting her symptoms.  *See, e.g.*, *id.* at 392 (noting that L.L. had "no support system;" had "depression, anxiety, difficulty sleeping;" and "[g]ets so anxious, overwhelmed" for no stated reason), 584 (noting that L.L. had "been experiencing insomnia for over a year, [went] multiple days on end without eating, [had] panic attacks approximately once a week, and [had] been isolating and engaging minimally outside of her home."), 785 (noting that L.L. had "anxiety and hypervigilance d/t where she lives" and "irritability, crying spells and emotionality esp [sic] re: son"), 932 (noting that L.L. "[endorsed] severe anhedonia," felt "unsafe in her neighborhood," and had both "financial stressors" and "parenting stressors").  An ALJ cannot selectively rely on some medical evidence in the record while ignoring others, and the record as a whole does not indicate that L.L.'s "main stressors appeared to be situational," as the Commissioner suggests.  *See* Def.'s Corrected Cross-Mot. at 4; *Edlund v. Massanari*, 253 F.3d 1152, 1159–60 (9th Cir. 2001); *Holohan v. Massanari,* 246 F.3d 11195, 1207–08 (9th Cir. 2001).  As such, the ALJ's determination that the opinions of L.L.'s treating providers conflict with her reported stress from disputes with her landlord and challenges accessing medical care is conclusory and not supported by substantial evidence.

Moreover, L.L.'s testimony that she did not obtain a service animal even though Christa Robertson recommended one has no bearing on the credibility of the opinions of her treating providers.  *See* AR 421.  At the hearing, L.L. testified that she wanted a service animal but did not trust her landlord to allow it because the landlord "violated [her] on everything" and forced her to get rid of her pet dogs.  *Id.* at 77.  Given L.L.'s legitimate reasons for not pursuing this accommodation, it was improper for the ALJ to discredit the opinions of L.L.'s treating providers using this evidence.  *See, e.g.*, *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) ("an 'adjudicator

must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain . . . failure to seek medical treatment.'" (citation omitted)).

Lastly, the opinions of L.L.'s treating providers are not inconsistent with L.L.'s testimony that she took up to four busses to reach her medical appointments or that she smoked a pack of cigarettes a day.  On the contrary, L.L.'s testimony largely confirms the findings of her treating providers.  For example, L.L. testified that while she used to take at least four busses to her doctors' appointments, she now qualifies for a transportation service based on her medical conditions.  AR 61.  When asked about her ability to walk, she explained, "it takes a long time and . . . going to the bus stops to catch the bus, it's, it's hard to do that too…[b]ut, of course I have to, I have no choice." *Id.* at 62.  When asked specifically why taking the bus is difficult, L.L. replied, "my COPD for one, and my depression and my anxiety all that stuff." *Id.* at 63.  She also described scanning the bus for signs of her childhood abuser. *Id.* at 70.  Taken together, her testimony corroborates the opinions of L.L.'s treating providers that her COPD, back pain, PTSD, and MDD limit her abilities.  The fact that she took the bus when she had to, despite the challenges it posed, does not discredit the opinions of her treating providers.  Likewise, L.L.'s testimony that she smokes a pack of cigarettes per day is insufficient for discrediting the opinions of her treating providers.  L.L. has been diagnosed with and treated for nicotine dependence, *id.* at 887–88, and the Ninth Circuit has opined that it is possible for a claimant to be "so addicted to cigarettes that she continued smoking even in the face of debilitating shortness of breath." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009).  The ALJ failed to account for that possibility in using this evidence to reject the opinions of L.L.'s treating providers.

### 3.  The ALJ Erred in Finding the Opinions of Dr. Catlin Unpersuasive

The ALJ also found Dr. Catlin's opinions unpersuasive, including the findings that L.L. had marked to extreme limitations in most functional categories[9] and would require over four

---

[9] The ALJ incorrectly stated that Dr. Catlin found that L.L. had marked and extreme limitations in

United States District Court
Northern District of California

United States District Court
Northern District of California

absences from work per month.  AR 29.  Dr. Catlin's mental consultative examination involved a clinical interview, a mental status examination, a Wechsler Adult Intelligence Scale ("WAIS-IV"), a Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"), and a Beck Depression Inventory ("BDI").  *Id.* at 696.  L.L.'s WAIS-IV and RBANS scores were in the extremely low range, and L.L.'s BDI score indicated that she experiences symptoms of severe depression.  *Id.* at 699–700, 708.  Despite these findings, the ALJ rejected Dr. Catlin's opinions for the same reasons that he rejected the opinions of L.L.'s treating providers.  *Id.* at 29–30.

The ALJ erred in failing to point to substantial evidence that Dr. Catlin's findings were inconsistent with evidence from other medical sources and nonmedical sources in the record.  As described above, "cherry-picked" observations of L.L.'s unremarkable mental status and L.L.'s testimony that she endures stress from her landlord, has not obtained an emotional support animal, takes the bus, and smokes cigarettes do not render Dr. Catlin's findings inconsistent with the record.  *See id.* at 29–30.  Dr. Catlin's findings are based in objective medical evidence and are consistent with the opinions of both L.L.'s treating providers and L.L.'s testimony.  As such, the ALJ erred in finding Dr. Catlin's opinions unpersuasive.

### 4.   The Opinions of L.L.'s Treating Providers and Dr. Catlin are Supported and Consistent

The opinions of L.L.'s treating providers and Dr. Catlin are supported by substantial medical evidence.  For example, the opinions of Pathways to Wellness providers are based on years of routine psychological evaluations, laboratory results and other tests, and psychiatric treatment records.  *See, e.g.*, *id.* at 12, 577.  Pujita Latchman's opinions are based on clinical findings from sixty therapy sessions.  *Id.* at 585.  Although Dr. Catlin's opinions are based on a one-time consultative examination, that examination involved five separate psychological assessments.  *Id.* at 696.

Moreover, the opinions of L.L.'s treating providers and Dr. Catlin are consistent with each

---

all functional assessment categories.  AR 29.  In fact, Dr. Catlin noted that L.L. had marked to extreme impairments in all categories except in adhering to basic standards of neatness and cleanliness, wherein Dr. Catlin found that L.L. had no impairment.  *Id.* at 704.

other, with L.L.'s testimony, and with the record as a whole.  Both Dr. Catlin and Christa

Robertson determined that L.L.'s impairments rendered her unable to work for a period of at least

one year.  *Id.* at 420, 705.  Dr. Harris, Amber Aguilar, and Dr. Catlin determined that L.L. would

miss four days or more of work per month as a result of her impairments, which is consistent with

Pujita Latchman's finding that L.L. does not get out of bed or eat for twenty-four to forty-eight

hours at a time and L.L.'s testimony that she is "just depressed" and "[doesn't] wanna get out the

bed."  *See id.* at 64, 16, 581, 590, 704–05.  Similarly, Dr. Harris determined that L.L. would be off

task 25% of the time and Amber Aguilar determined that L.L. would be off task 30% of the time

at work, which is consistent with L.L.'s testimony regarding her forgetfulness when completing

household chores as well as Dr. Catlin's findings that L.L. has a marked impairment in

maintaining adequate pace and persistence to perform simple tasks, in maintaining her attention

for a two-hour segment, and in performing at a consistent pace without an unreasonable number

and length of rest periods.  *See id.* at 16, 581, 704.

To the extent that the opinions of L.L.'s treating providers and Dr. Catlin conflict with the

opinions of the non-examining consultants and Dr. Shertock, the opinions of L.L.'s treating

providers and Dr. Catlin are supported by significantly more medical evidence.  While L.L.'s

treating providers relied on years of treatment records and Dr. Catlin relied on five psychological

assessments, the state agency medical consultants relied solely on a review of L.L.'s existing

medical records, and Dr. Shertock relied only on a review of L.L.'s medical records and one

mental status examination.  *Id.* at 88–133, 448–50.  As such, the opinions of L.L.'s treating

providers and Dr. Catlin are significantly more supported by relevant and objective medical

evidence.  Since their opinions are supported and are consistent, the ALJ erred in finding them

unpersuasive.

### 5.  The ALJ Erred in Finding the Opinions of the Non-Examining Consultants Persuasive

The ALJ found the opinions of L.L.'s non-examining state agency medical consultants

persuasive, including their assessment of L.L.'s physical and mental capabilities.  *Id.* at 29.  After

reviewing L.L.'s records and again upon reconsideration, the consultants determined that L.L. was

not disabled. *Id.* at 109, 132.  The ALJ was persuaded by the consultants' opinions that L.L. "could perform light work, occasionally climb ladders, ropes, and scaffolds, frequently perform all other postruals [sic], and avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation." *Id.* at 29, 103–05, 128.  The ALJ was also persuaded by the consultants' determination that L.L. "could sustain concentration, persistence, and pace for simple tasks, requires limited contact, and adapt [sic] to infrequent changes." *Id.* at 29, 105–07, 128–30.  As described above, the non-examining consultants relied exclusively on existing medical evidence to support their opinions and did not perform independent medical assessments. *Id.* at 88–133.  The ALJ erred in finding the opinions of the non-examining medical consultants persuasive under the new regulations, since their opinions are not supported by substantial medical evidence and are generally inconsistent with the record. *See id.* at 29.

The ALJ concluded that the non-examining consultants' opinions were "supported by a discussion of the claimant's impairments," but the ALJ failed to cite specific evidence of such discussion. *See id.* at 29.  Likewise, the Commissioner contends that the consultants properly found that L.L. generally had "normal memory, thought processes and content, full orientation, fair insight and judgment" and that L.L. "remained able to sustain concentration, persistence and pace to carry out simple instructions despite some moderate limitations, limited contacts with others, and the need for infrequent change in the work environment," but the Commissioner does not identify the evidence the consultants used to make this determination.  Def.'s Corrected Cross-Mot. at 5.  Although the consultants summarized L.L.'s medical record and determined that she had severe "sprains and strains," severe "asthma," and severe "depressive, bipolar and related disorders," they did not adequately explain why they found that L.L. was not disabled based on those impairments. *See id.* at 95–100, 120–23.  Instead, they relied on inaccurate statements of the record and conclusory logic.  For example, a consultant alleged that Dr. Harris improperly "cite[d] difficulties w/ concentration, remembering etc [sic]" "based on subjective reports" on a July 16, 2018, Mental Health Questionnaire, since "objective reports from prior visits [did] not reflect this." *Id.* at 99.  But on April 14, 2017, a Pathways to Wellness provider assessed that L.L. had marked "[d]ifficulties in maintaining concentration, persistence of place." *Id.* at 395.

Additionally, the consultants found that L.L.'s medical record contained "sx exaggerations at every level, including c/o hallucinations that are not convincing" and that L.L. reported "severity of allegations not fully supported by objective medical evidence," but the consultants did not explain how they reached those conclusions.  *Id.* at 100–02.  Without further discussion, the Court finds that the opinions of the consultants are not supported by substantial medical evidence or explanation.

The ALJ also erred in concluding that the non-examining consultants' opinions were consistent with the record.  *Id.* at 29.  The ALJ found that the consultants' opinions were "generally consistent with the evidence that, at times [L.L.] had reduced range of motion and reduced strength in her left knee, pain with lumbar range of motion, walked slowly, and had some wheezing and decreased breath sounds, limiting her to light work with the postural and environmental limitations above."  *Id.*  Moreover, the ALJ found that the consultants' opinions were "consistent with the evidence that . . . at times, [L.L.'s] mood was depressed and her affect was depressed, anxious, and irritated, her memory was impaired, her concentration was poor, her impulse control was fair, her insight was fair, and her judgment was fair, limiting her to work with the mental limitations above."  *Id.*  But neither line of reasoning comports with the finding that L.L. could perform light work.  Furthermore, most of the records that the ALJ cited to establish that the consultants' opinions were consistent are from L.L.'s treating providers or Dr. Catlin, whose opinions generally conflict with the consultants' opinions of L.L.'s abilities.  *See, e.g.*, 29, 392, 551, 552, 696, 782, 931.  It is unclear how the ALJ could have used evidence from L.L.'s treating providers and Dr. Catlin to establish that the consultants' opinions were consistent with the record.  .

Ultimately, the ALJ erred in finding the opinions of the non-examining consultants persuasive, since their opinions are not sufficiently supported or consistent.

## C.    The ALJ Improperly Rejected L.L.'s Testimony and Allegations

The ALJ also improperly rejected L.L.'s allegations regarding the intensity, persistence, and limiting effects of her symptoms because he failed to offer clear and convincing reasons for determining that her allegations were inconsistent with the evidence in the record.  As set forth

United States District Court
Northern District of California

above, L.L. testified about her physical and mental limitations at the hearing before the ALJ. She

also completed one Adult Function Report on March 26, 2018, describing, *inter alia*, her

difficulties walking, breathing, getting out of bed, sleeping, concentrating, following instructions,

preparing food, performing household chores, getting along with family, coping with depression

and past trauma, and fearing her childhood abuser. *Id.* at 319–325. The ALJ found that L.L.'s

"medically determinable impairments could reasonably be expected to cause the alleged

symptoms" but that her "statements concerning the intensity, persistence and limiting effects of

these symptoms are not entirely consistent with the medical evidence and other evidence in the

record." *Id.* at 27. The Court is not persuaded that L.L.'s allegations are inconsistent with the

evidence that the ALJ cited.

### 1. Legal Standards

In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis.

*Trevizo*, 871 F.3d at 678. The ALJ must first determine "whether the claimant has presented

objective medical evidence of an underlying impairment 'which could reasonably be expected to

produce the pain or other symptoms alleged.'" *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d

1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).

If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can

reject the claimant's testimony as to the severity of the symptoms "'only by offering specific, clear

and convincing reasons for doing so.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008)

(quoting *Smolen*, 80 F.3d at 1281). These reasons must be "sufficiently specific to permit the

court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v.

Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). "General findings are insufficient." *Reddick v.

Chater*, 157 F.3d 715, 722 (9th Cir. 1998). In the context of mental health, it is an error to reject a

claimant's testimony based on isolated instances of improvement, since symptoms regularly wax

and wane during treatment. *See, e.g.*, *Holohan*, 246 F.3d at 1205 (9th Cir. 2001); *Garrison*, 759

F.3d at 1017.

Here, the ALJ found that L.L.'s "medically determinable impairments could reasonably be

expected to cause the alleged symptoms" without pointing to any affirmative evidence of

malingering.  AR 27.  Thus, the ALJ needed to provide "specific, clear and convincing reasons" for rejecting L.L.'s testimony concerning the intensity, persistence, and limiting effects of her symptoms.  *See Tommasetti*, 533 F.3d at 1039.

### 2. L.L.'s Allegations Were Not Inconsistent with Her Physical and Mental Status Examinations

L.L. testified regarding several exertional limitations, including difficulty lifting a ten-pound bag of potatoes due to her back pain, losing her breath after walking half a block, difficulty standing for more than ten minutes, her inability to bend over to wash her tub, her inability to stand and wash her dishes without taking breaks, a bone spur that causes her to limp, and difficulty sitting for long periods of time without needing to move around to relieve her back pain.  AR 62, 63, 68, 74.  In considering L.L.'s allegations regarding her exertional limitations, the ALJ found L.L.'s "allegations of disability are inconsistent with her generally unremarkable physical examinations," including her allegedly "normal respiration, normal pulmonary function, normal gait, normal coordination, normal range of motion in all extremities, full strength in all extremities, and normal sensation."  *Id.* at 28.  The evidence that the ALJ used to reject L.L.'s allegations of her exertional limitations is not specific, clear, and convincing.

Nearly all the ALJ's citations to L.L.'s "generally unremarkable physical examinations" are misleading and do not support this assertion.  For example, the ALJ cited records of L.L.'s emergency room visit on September 7, 2017, which contains some boilerplate notations of normal systems but also describes L.L.'s cough, chest pain, and "[d]ecreased breath sounds throughout with some inspiratory wheezing."  *Id.* at 425—26.  L.L. was diagnosed with asthmatic bronchitis on that visit.  *Id.* at 426.  The ALJ cited L.L.'s internal medicine CE by Dr. Tang, which found generally normal gait and mobility but also found that L.L. had a wet cough throughout the examination.  *Id.* at 443.  The ALJ cited records of an emergency room visit on October 25, 2017, for shortness of breath and coughing with yellow sputum.  *Id.* at 455, 459.  Those records contain boilerplate notations of normal gait and sensation, but during that visit an examiner found "tachycardic with low normal room air saturation and poor air movement bilaterally," and L.L. was ordered a two-hour nebulizing treatment.  *Id.* at 463.  The ALJ cited records of L.L.'s follow-

up appointment for COPD, chest pain, chills, and right heel pain on December 15, 2017, which notates that L.L.'s respiratory effort was normal but also indicates findings of moderate wheezing. *Id.* at 515.  The ALJ cited Putjita Latchman's psychiatric evaluation on March 15, 2017, where checkboxes for normal muscle strength, tone, gait, and stance are checked, but that evaluation was not intended to assess L.L.'s physical health.  *Id.* at 586.  Finally, the ALJ "cherry-picked" boilerplate notations of normal findings from physical examinations in two follow-up visits with Eastmont Wellness Center, one for vaginal discharge and another for COPD and her bone spur, *id.* at 668, 719, but the ALJ neglected to discuss several abnormal findings from other appointments at the same clinic.  *See, e.g.*, 596, 728, 737.  Moreover, in one of those appointments, L.L. was prescribed additional pain medication to manage pain from walking, which does not indicate normal sensation.  *Id.* at 668.  Taken together, none of the evidence that the ALJ cited of allegedly "unremarkable physical examinations" provides specific, clear, and convincing reasons for discounting L.L.'s testimony and allegations regarding the severity of her physical symptoms.

With respect to L.L.'s psychiatric symptoms, the ALJ found L.L.'s "allegations of disability are also inconsistent with her generally unremarkable mental status examination," as described above, in section IV(B)(2).  *Id.* at 28.  The Court has already addressed the ALJ's error in relying selectively on notations of L.L.'s allegedly "unremarkable mental status" when he rejected the opinions of L.L.'s treating providers and Dr. Catlin.  For the same reasons, the ALJ erred to the extent he offered these reasons for declining to credit L.L.'s allegations with respect to the severity of her psychiatric symptoms.

### 3.  L.L.'s Allegations Were Not Inconsistent with Her Activities of Daily Living

The ALJ also found that L.L.'s allegations of disability were "inconsistent with her activities of daily living" including her ability to "bathe and dress without assistance or reminders, prepare simple meals, do light housework like sweep, wash dishes and do laundry, take public transportation, shop in stores for food and clothing, and manage her own money."  *Id.*  The Commissioner alleges that L.L. should be discredited because she did not seek inpatient psychiatric care, did not quit smoking, and discontinued physical therapy.  Def.'s Corrected Cross-Mot. at 8.  Additionally, the ALJ found that L.L.'s testimony that sitting is difficult is inconsistent

United States District Court
Northern District of California

with the fact that she "sat more than 45 minutes throughout the hearing before getting up to stand." AR 30.

"[I]nconsistencies . . . between [a claimant's] testimony and [her] conduct [or] daily activities" is a legitimate factor "in weighing a claimant's credibility." *Orn*, 495 F.3d at 636. The ALJ can only rely on daily activities, however, "if a claimant is able to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Id.* at 639. "The ALJ must make specific findings relating to the daily activities and their transferability." *Id.* In addition, the Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016; *see also Smolen*, 80 F.3d at 1284 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits."). Indeed, "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

Here, the ALJ failed to demonstrate any logical inconsistency between L.L.'s allegations and her daily activities. As an initial matter, the ALJ did not demonstrate that L.L. spends a substantial part of her day engaged in the listed activities. *See Orn*, 495 F.3d at 639. Additionally, the ALJ did not explain how bathing, dressing, preparing simple meals, performing light housework, taking public transportation, and shopping for food and clothing involve the performance of physical functions that are transferrable to a work setting. *See id.* Moreover, L.L.'s descriptions of her daily activities are largely consistent with her allegations of how her impairments impact her ability to work. For example, L.L. testified that on an average day, she does not want to get out of bed and does not talk to anyone on the phone due to her depression. AR 64. Later in the hearing, she testified that she does not leave the house except to go to the library or the store. *Id.* at 67. Despite the ALJ's assertion that L.L. can "prepare simple meals," L.L. stated on her Adult Function Report that she "barely cook[s]" and "make[s] a lot of top

ramen." *Id.* at 321.  When asked about her ability to follow a recipe, L.L. testified that she has difficulty following written or verbal instructions and is easily frustrated when doing so.  *Id.* at 71. The ALJ also asserted that L.L. can wash dishes, but L.L. testified that she is often unable to stand long enough to finish her dishes without taking breaks.  *Id.* at 68.  L.L. testified that she often forgets she is cooking or washing dishes, that she needs her son to remind her, and that she was seeking a reasonable accommodation so her son could help with her chores.  *Id*.  She also testified that she is unable to bend over to clean her tub.  *Id*.  While the ALJ emphasized L.L.'s ability to take public transportation, L.L. described significant pain, discomfort, and anxiety that she experiences when doing so.  *Id.* at 62, 63, 70.  Moreover, L.L.'s description of how her impairments impact her activities of daily living are generally consistent with the findings of L.L.'s treating providers and Dr. Catlin.  *See, e.g.*, *id.* at 420, 582, 584, 697.  As such, the ALJ failed to provide specific, clear, and convincing evidence for determining that L.L.'s allegations of disability are inconsistent with her activities of daily living.

The Commissioner alleges that L.L.'s failure to seek psychiatric inpatient treatment, her failure to stop smoking despite respiratory complaints, and her discontinuation of physical therapy should further discredit her.  Def.'s Corrected Cross-Mot. at 8.  But the Commissioner has not established that L.L.'s providers prescribed inpatient psychiatric treatment, and the Commissioner does not cite any rules, laws, or cases requiring a claimant to seek such care for her allegations of mental disability to be persuasive.  Second, the Court has already considered why nicotine dependence may explain L.L.'s failure to quit smoking despite her respiratory symptoms.  Third, L.L. attended five physical therapy sessions, and she testified that those sessions increased her pain.  *Id.* at 80, 407.  It would be improper for the Court to penalize L.L. for discontinuing a course of treatment that worsened her symptoms, especially when she found it difficult to travel to medical appointments.  *See id.* at 62–3.

Lastly, L.L.'s testimony regarding her difficulty sitting is not contradicted by the fact that she was able to sit through her hearing.  While L.L. may have remained seated, she also described needing to shift her posture to avoid putting pressure on her back.  *Id.* at 75.  When asked how long she could sit before needing to get up or move around, she replied, "[w]ell, I'm sitting here

because I have to . . . [b]ut, not that long . . . I still be uncomfortable with sitting, so I have to move around." *Id.* The ALJ failed to explain why L.L.'s ability to sit through her hearing should discredit her testimony that prolonged sitting is uncomfortable. The fact that she endured discomfort in one instance where she felt obligated to stay seated is not convincing evidence to discredit her testimony.

**D.** **The ALJ's Determination Regarding Whether L.L.'s Impairments Meet or Equal the Severity of the Listed Impairments at Step Three is Moot**

L.L. argues that if the ALJ had properly considered the opinions of Dr. Harris, Pujita Latchman, and Dr. Catlin, he would have found that her conditions meet or equal listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders). Pl.'s Mot. (dkt. 25) at 23. The Commissioner argues that this contention is conclusory. Def.'s Corrected Cross-Mot. at 8.

The Court declines to reach this issue. The ALJ erred by rejecting the opinions of L.L.'s treating providers and Dr. Catlin, by finding the opinions of the non-examining consultants persuasive, and by rejecting L.L.'s testimony and allegations regarding the severity of her symptoms. As described below, if the ALJ had properly considered this evidence, his formulation of the RFC would have resulted in finding that L.L. is unable to work according to the VE's testimony. *See* AR 86. As such, the issue of whether L.L.'s conditions meet or equal the above listings is moot.

**E.** **The ALJ Erred in Formulating the RFC**

The RFC adopted by an ALJ must reflect all the relevant evidence in the case record. SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"). Here, the ALJ's RFC determination did not sufficiently consider many of the limitations assessed by L.L.'s treating providers, Dr. Catlin, and L.L.'s own testimony. *See* AR 26–30. For example, the ALJ's RFC determination did not consider Dr. Harris's findings that L.L. would be off task 25% of the time at work, which is corroborated by Amber Aguilar's finding that L.L would be off task 30% of the time. *Id.* at 16, 581. The RFC determination also did not consider Dr. Harris's, Amber Aguilar's, and Dr. Catlin's findings that L.L. would miss four days or more of work per month due

33

to her impairments and her need for medical treatments.  *Id.* at 16, 581, 705.  The RFC did not

consider Dr. Catlin's findings that L.L.'s memory and attention were severely impaired, her

general cognitive ability was within the extremely low range of intellectual functioning, and that

she would have an overall marked impairment performing in the workplace.  *Id.* at 699–708.  The

RFC determination also did not consider Christa Robertson's reports that L.L. was unable to work

for a year or more.  *Id.* at 420, 481.  Additionally, the RFC determination did not consider Pujita

Latchman's finding that it was normal for L.L. to not get out of bed or eat for twenty-four to forty-

eight hours.  *Id.* at 584.  Lastly, the ALJ's RFC determination under-credited L.L.'s testimony

regarding the severity of her symptoms and over-credited the opinions of the non-examining state

agency consultants.  *See id.* at 26–30, 98, 109, 132.

### F.    Remedy

"A district court may affirm, modify, or reverse a decision by the Commissioner 'with or

without remanding the cause for a rehearing.'" *Garrison v. Colvin*, 759 F.3d at 1019 (quoting 42

U.S.C. § 405(g)) (emphasis omitted). "If additional proceedings can remedy defects in the original

administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654

F.2d 631, 635 (9th Cir. 1981).  On the other hand, the court may remand for award of benefits

under the "credit-as-true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for

rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no]

outstanding issues that must be resolved before a disability determination can be made" and

"further administrative proceedings would [not] be useful"; and (3) "on the record taken as a

whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017)

(citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that

a district court abused its discretion in declining to apply the "credit-as-true" rule to an appropriate

case). The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt

as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act,"

*Garrison*, 759 F.3d at 1021, or when "there is a need to resolve conflicts and ambiguities."

*Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

Here, the Court awards benefits under the "credit-as-true rule."  For the reasons set forth

34

1    above, the ALJ failed to provide legally sufficient reasons for rejecting the opinions of L.L.'s

2    treating providers and Dr. Catlin as well as L.L.'s symptom testimony.  The ALJ also provided

3    legally insufficient reasons for finding the opinions of the non-examining providers persuasive.

4         Second, further proceedings would not be useful since there are no outstanding issues that

5    must be resolved to make a disability determination.  If the ALJ had properly considered all the

6    evidence in the record, his determination of L.L.'s RFC would have found that L.L. is

7    unemployable.  The VE testified that a person cannot miss more than one day of work per month

8    or be off task more than 15% of the time and still be employable.  AR 86.  If the ALJ had not erred

9    in considering the evidence, the RFC determination would have precluded the VE from finding

10   any job in the national economy that L.L. could perform at step five.

11        Finally, there is no doubt as to disability.  When credited as true, L.L.'s testimony and the

12   opinions of L.L.'s treating providers and Dr. Catlin demonstrate that L.L. is disabled.  Despite

13   seeking routine care and taking many medications to manage her conditions, L.L. rarely leaves her

14   house, spends most of her time in bed, goes days without eating, has difficulty sleeping, is unable

15   to stand long enough to perform certain chores, is forgetful and easily overwhelmed, has difficulty

16   breathing, and struggles to cope with her past trauma.  *See, e.g.*, *id.* at 57–80, 392, 396, 421, 440,

17   584, 590, 696–705, 785, 932.  Several psychological assessments determined that L.L. has mostly

18   marked and extreme impairments in a range of work-related activities.  *Id.* at 703–05.

19        The Commissioner argues that there remains "serious doubts as to Plaintiff's disability in

20   light of the limited objective medical evidence, and Plaintiff's non-compliance with medical

21   advice including continued drug and alcohol use."  Def.'s Corrected Cross-Mot. at 8 n.7.  The

22   Commissioner further argues that "the ALJ must determine whether the drug or alcohol addiction

23   is a material factor contributing to disability."  *Id.* (citing 20 C.F.R. §§ 404.1535(b)(2),

24   416.935(b)(2)).  These arguments are meritless, first and foremost because there are over thirty

25   exhibits of medical evidence in the record, including three treating source opinions and three

26   examining opinions.  Furthermore, application of the rules that the Commissioner cites regarding

27   L.L.'s alleged "drug and alcohol abuse" do not point to the conclusion that L.L. is not disabled.

28   The Commissioner has cited no evidence indicating that L.L.'s low back degenerative disk

disease, left knee degenerative joint disease, MDD, PTSD, or panic disorder with agoraphobia are impacted by smoking cigarettes or her use of marijuana and alcohol.  *See* AR 23; 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2).  As such, the Court is satisfied that the record is adequately developed and that no further proceedings are required.

## V.     CONCLUSION

For the reasons discussed above, L.L.'s motion is GRANTED, the Commissioner's motion is DENIED, and the Commissioner's final decision that Plaintiff is not disabled is REVERSED. The Court REMANDS for an immediate calculation and award of benefits by the Commissioner. The Clerk is instructed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

Dated:  July 20, 2022

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California